BARRETT et al. v. SHEAFFER.

(Circuit Court of Appeals, Seventh Circuit. January 2, 1918.)

No. 2519.

1. PATENTS ⟨⟩328—VALIDITY—INFRINGEMENT—FOUNTAIN PENS.
    The Sheaffer patent, No. 1,118,240, for improvements in attachments for fountain pens, consisting of a spring means arrangement within the casing to lift the presser bar in a fountain pen, independent of the compressible reservoir, and firmly holding the lever in open or closed position, *held* valid, showing invention, and claims 1 and 2 to have been infringed.

2. PATENTS ⟨⟩259—CONTRIBUTORY INFRINGEMENT.
    Where, prior to the issuance of complainant's patent for improvements in fountain pens, one of the defendants entered into a contract to make holders for its codefendant, which was manufacturing and selling fountain pens infringing complainant's patent, and such defendant, on the day after the patent was issued, and with knowledge that it was about to be issued, delivered incomplete holders, which could be used only for the infringing device, and evinced an intention to deliver other holders, such defendant must be deemed guilty of a contributory infringement, and the patentee is entitled to injunctive relief and an accounting as to both defendants.

Appeal from the District Court of the United States for the Eastern Division of the Northern District of Illinois.

Suit by Walter A. Sheaffer against C. E. Barrett and the Kraker Pen Company. From a decree for complainant, defendants appeal. Affirmed in part, and in part reversed.

This appeal involves the decree of the district court sustaining the validity of claims 1, 2, 3, 4, 5, 7 and 11 of patent No. 1,118,240, issued to W. A. Sheaffer on November 24, 1914, for improvements in attachments for fountain pens, and awarding the same to appellee, entered May 23, 1917. The gist of the invention consists in spring means arranged within the casing to lift the presser bar in a fountain pen, independent of the reservoir, and firmly hold the lever in open or closed position. Claim 1 reads as follows:

"1. In combination with a fountain pen having a hollow casing with a slot extending longitudinally thereof and a lever fulcrumed in said slot, a compressible ink reservoir inserted within said casing, of means operable independent of said reservoir and arranged within said casing for firmly holding said lever in either open or closed position."

⟨⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Figs. 1 and 2 of the drawings will serve to illustrate the device:

The pens of the prior art were provided, some with filling means operable by depressing the presser bar upon the ink reservoir with the finger, a coin, or a pin provided for that purpose from outside the case, having no lever, as in Hamilton patent, No. 781,649, issued February 7, 1905, and Kaufmann patent, No. 827,022, issued July 24, 1906. These have lifting means for raising the presser bar, independent of the ink reservoir. Barnes patent, No. 726,495, issued April 28, 1903, Sheaffer patent, No. 896,861, issued August 25, 1908, and Swedish patent to Johansson, No. 5,380, issued August 18, 1894, disclose the use of a lever in compressing the ink reservoir and spring means for lifting the presser bar from the reservoir; compression and release being steps common to all self-filling fountain pens, in order that a vacuum may be created in the rubber ink container to facilitate the inflow of ink thereinto.

Conceiving that all the devices of the prior art failed to firmly hold in place the lever, whether open or closed, as well as to provide efficient means for uniformly operating the presser bar—both without the aid of the resilient rubber ink reservoir—Sheaffer, by combining the lever of the prior art with a spring and presser bar within the case, brought the presser bar up against the lower end of the lever and kept it there, both in open and closed positions, by spring action in such a manner as to control the lever firmly in either position. In so doing he took the flat removable spring bar shown in Duryea, cut a longitudinal slot therein under the lower end of the lever as pivoted, passed the previously adjusted lower end thereof through the slot in the spring bar, the flat bar like Duryea's, and thus caused the lever foot to be firmly rested upon the top of the presser bar, when in action causing certainty of movement, and when not in action housed in the slot, and also, when it was released from lever pressure, lifting the presser bar firmly against the foot or lower part of the lever; all without any strain upon the ink reservoir.

It seems to be very desirable in fountain pens that there be certainty of movement of the parts in order to avoid leakage and other disarrangement. The spring bar of the patent is of such construction that the locking means is very reliable. This is in substance the interpretation given to the first claim. Claim 2 is practically the same as claim 1, except that it calls especially for a tubular reservoir, and also for means arranged between the inner wall of the casing and the reservoir for yieldingly compressing the reservoir. Claim 3 likewise is the same as claim 1, with the addition of means for limiting the opening movement of the lever, as disclosed in the drawings, a detent raised on the top surface of the presser bar to engage and limit the extent of the movement of the lower end of the lever and also the adjustment of the outer end wall of slot 9 in the spring bar through which the lever passes, so that said end wall will co-operate with the detent on the presser bar in limiting the movement of the lever. Claim 4 has special reference to the adjustment of the friction, i. e., split ring-held spring and presser bar in operative position—the spring bar slotted as above described, the slot being so arranged as

to limit the movement of the lever, and yieldably hold the same in open or closed position. Claim 5 covers specifically the co-operation of the end wall of the slot in the spring bar and the detent on the presser bar above mentioned, to limit movement of the lever and to protect the same. Claim 7 covers the provision fulcruming the lever in the casing slot and locating the lower end of the lever within the slot in the spring bar at all times, thereby preventing rotation of the spring bar. Claim 11 covers the improvements of claims 1, 2, 3, 4, 5, and 7 as a combination, and reads as follows:

"11. The combination with a slotted fountain pen casing having a compressible ink reservoir and a lever operable in said slot, of a reservoir compressing device comprising a double bar provided with means for removably holding it within the casing, said double bar being composed of a resilient arm having a slot therein to at all times receive the lever and to be thereby held against turning or lateral movement in the casing, and another arm secured to one end of said resilient arm and extending parallel therewith for engagement with the compressible ink reservoir, one end wall of the slot in said resilient arms being positioned to limit the swinging movement of the lever in one direction."

Appellants' alleged infringing device—Kraker's present pen—contains within its case means, operable independent of its reservoir, for firmly holding its lever in either open or closed position. Its spring means consist of a wire loop extending from a position near to the end of the presser bar, where its spring head is located, to a tongue on the bottom of the presser bar, about one-third of the length of the latter, in which tongue it is caught and loosely held, whereby the presser bar is controlled when not under the influence of the lever. There is no open slot in a spring bar through which the lever end operates upon the presser bar. The presser bar is rigid, and, when depressed by the lever, descends uniformly upon the reservoir, to exclude ink and air. When released, the bar is lifted by the spring into contact with the prostrate lever, firmly holding it in closed position. When the lever is in an open position, its foot rests and moves on the presser bar, and by upward tension of the spring within the casing is held firmly in an open position. The reservoir is free to inflate without interference of the presser bar or the lifting means. In addition to the spring device in the casing for lifting the bar and holding the lever in position, the lever carries, resting within the slot, but working outside the casing when open, a supplemental spring for holding it in open and closed position. This spring is mainly relied on by appellants to differentiate their pen from that in suit, while appellee insists that it is surplusage, and only used for misleading the court and public. The following drawings of appellants' alleged infringing device are taken from appellants' brief:

The usual defenses of invalidity and noninfringement are pleaded, and, in addition, that Sheaffer was not the first inventor of the substantial subject-matter of the patent, or, as appellants put it, the invention did not originate with Sheaffer. It appears that appellants' assignor, one Craig, had, on February 27, 1914, and April 9, 1914, respectively, filed applications for patents pertaining to the subject-matter here involved after the patent in suit was issued, and about December 9, 1914, he amended his applications by inserting

claims 1, 2, 3, 4, 7, and 11 from appellee's said patent. Thereafter such proceedings were had that the examiner in interference and the examiners in chief awarded the invention to Sheaffer. Since the commencement of this suit this action has been affirmed by the Commissioner of Patents. The pendency of this proceeding is urged by appellants as a reason for not disposing of this suit at the present time, they insisting that the patent was inadvertently issued inasmuch as the interference has not been disposed of.

Appellee seeks to hold one Barrett, manufacturer of the pen barrels or casings for Kraker Pen Company, as a contributory infringer. He supplied casings to appellant pen company, prepared for and adapted to the insertion by appellant of the alleged infringing parts, only. The district court entered a decree for the appellee.

The errors assigned are (1) that the District Court sustained the patent; (2) that it held appellants' device to infringe the patent; (3) that it charged appellant Barrett & Co. to be guilty of contributory infringement; (4) that it awarded the claims in suit to appellee.

Other facts appear in the opinion.

Hans v. Briesen, of New York City, for appellants.

Frank T. Brown, of Chicago, Ill., for appellee.

Before BAKER, KOHLSAAT, and ALSCHULER, Circuit Judges.

KOHLSAAT, Circuit Judge (after stating the facts as above). [1] The substance of claims 1 and 2 in suit consists in adding to the prior art self-filling pen means for holding the pen lever of a self-filling pen in position, or, as expressed in claim 1, "firmly holding said lever in either open or closed position." The lever works against the tension of the spring bar and the resiliency of the rubber reservoir to exclude the ink from the latter. The reaction of this tension serves to yieldingly hold the presser bar firmly up against the lower end of the lever when in open position and firmly hold the lever in that position. When released, the spring bar, without any aid from the resiliency of the rubber reservoir, lifts the presser bar from the top of the reservoir up into snug contact with the spring bar against the inner wall of the casing and such portions of the lever as rest in the casing slot flush with or even slightly below the plane of the under face of the spring bar, thereby preventing vertical or other movement of the lever, and firmly holding the same in closed position, besides facilitating the insertion and removal of the ink reservoir.

The objects sought are to prevent accidental pressure upon the ink reservoir through a careless handling of the lever, and keep the lever handle from leaving the casing slot. In the former case, the presser bar may be depressed, with consequent leakage, and in the other the lever handle, coming in contact with the pocket, would be likely to tear it, and itself be lifted toward open, and consequently operative, position, when not desired, and subjected to strain and other injury.

It was not new to employ barrels, or casings, rubber reservoirs, presser bars, levers fulcrumed in the casing slot, spring-actuating devices for lifting the presser bar, and other means for operating and relieving the rubber ink reservoir, but there nowhere appears any pen containing the combination of the patent in suit. Hamilton and Kaufmann call for lifting means independent of the ink receptacle, and employ a spring in the casing, but have no lever for depressing the ink sack, nor lever locking means. Nor do their devices make any sug-

gestion to that end. Barnes, Sheaffer (1908), and Johansson are provided with compressing levers, but rely upon the resiliency of the ink tank for whatever lifting or holding means they employ, and make no provision for locking the lever. These latter methods are liable to result in wear and disarrangement of the ink tank, and eventually in unfitting it for use. In the self-filling fountain pen art accuracy is very desirable. Accidental lifting of the lever causes depression of the presser bar and effects an escape of ink, which soils the pocket, wastes the ink, and serves to make the pen unpopular. Therefore claim 1 of the patent calls for "firmly holding," and claim 2 for "holding," the lever in open or closed position.

Claims 1 and 2, we think, cover a new combination of old parts and a new result. It was not new to substitute the lever for the finger pressure of Hamilton or the pin of Kaufmann, unless a new result was obtained thereby. The examiner so held. It is this new result that Sheaffer claims, viz., means operable within the casing and independent of the reservoir for firmly holding the lever in either open or closed position, as above described.

The invention is narrow, but in view of its value to the self-filling pen art, the presumption implied in the grant, and in view of the fact that, notwithstanding the approaches to it in the art, no effort was made to carry forward the improvements preceding it the one step further which has brought it out from the undiscovered, we are satisfied that the device of claims 1 and 2 was patentable, and therefore entitled to protection. The contention of the appellants that it is disclosed in the Johansson Swedish patent is not well made. The meager statements of that patent, as well as the drawings, fail to satisfy us that the presser bar rests against the eccentric base of the lever. Considerable space above the bottom of the presser bar is shown in figure A of the drawings. There is no spring-lifting means; the rubber reservoir being the only lifting element. The presser bar is in the form of a V-shaped trough, made of tin, and does not constitute a spring. Very clearly, this patent does not at all anticipate the claims in suit.

Appellants' device may be considered without the supplemental spring located on the lever handle. We are of the opinion from the evidence that the spring elements within the casing of the alleged infringing penholder sufficiently control and hold the movements of the lever for the purposes of this proceeding, without the intervention of the lever spring. Speaking of the alleged infringing device, appellants say:

"This presser bar is under spring control as the result of the coil spring at the left hand of the figure; this being in accordance with the teachings of Hamilton and generally what is shown in the Swedish patent or the Duryea."

It appears from the drawings of appellants' pen, shown in the brief, that the inner end of this coil spring is beneath the presser bar when the lever is open, and therefore presses upwardly against it, and consequently tends to yieldingly crowd the lever foot upwardly, thus holding it firmly in open position. On the other hand, the tension of the spring lifts the lower end of the lever when released, and securely holds it against the upper wall of the pen casing, or snugly within the slot, or

both, as in the claims in suit. While appellants' device lacks the specific spring bar of the patent, their double wire spring arms are clear equivalents therefor and for appellee's lifting elements; they create a firm, upward tension against the lever, whether in open or closed position and hold it in place.

We therefore are of the opinion that the so-called commercial device of appellants, that is, appellee's cross-exhibit Kraker Pen Company's present pen, if made after the patent was obtained, infringed claims 1 and 2 thereof, but did not infringe any of the other or specific claims of the patent; as it contains none of the improvements set out therein. There is in the alleged infringing device no means for limiting the opening movement of the lever as in claims 3, 4, and 5; no means for locating the foot of the lever within the slot in the spring bar for preventing turning in the casing, as in claim 7; none of the provisions of claim 11, except such as are common to all the claims in suit. Such being the case, we therefore find appellants not guilty of infringement as to each of the claims 3, 4, 5, 7, and 11 in suit.

[2] It will be remembered that the patent was issued, but not yet delivered, on November 24, 1914. In August, 1914, prior to the issue of the patent in suit, appellant Barrett accepted an order from the Kraker Pen Company to make 10,000 holders for fountain pens, upon which he secured a payment of $5,000. He expected to make the holders so they should take the double bar, like a sample holder given Sheaffer before the suit was brought. The sample was introduced in evidence as "Complainant's Exhibit Defendants' Sample Holder." Of these holders, he delivered about 1,000 to the Kraker Pen Company in the early part of November, prior to the date of the patent, and on November 25, 1914, delivered 108 holders to the Kraker Pen Company, the day after the issue, all of which were slotted, and 14 of which were drilled for the lever pivot. He testified that he expected to deliver the balance of about 9,000 to the Kraker Pen Company some time, since they were paid for. In December, 1914, appellants' foreman delivered to appellee on request a pen like one of the 108 delivered November 25, 1914, which was introduced in evidence by appellee as "Complainant's Exhibit Defendants' Incomplete Holder." Appellant Barrett still has on hand 304 holders like the 108, all slotted and some drilled. Three thousand of the other holders on hand have the metal parts inserted, but are not slotted or drilled.

The case for infringement presents itself somewhat like this: The Kraker Pen Company was marketing, and, of course, manufacturing, the fountain pen introduced in evidence as Kraker Pen Company's present pen, after the suit was begun, and such manufacture and marketing of that pen constituted an infringement of the fountain pen of claims 1 and 2 of the patent in suit. Appellant Barrett & Co. delivered 108 pens to Kraker Pen Company the day after the patent was granted. It does not appear that at that time Barrett & Co. knew the patent was granted, though Barrett was told it was expected. Fourteen of these were slotted and drilled—the rest were only slotted. Barrett understood these holders would be made into the alleged infringing pens. In December, 1914, appellant Barrett delivered a sample like the 108,

presumably slotted and drilled, to Sheaffer. It does not appear that Barrett delivered any other pens after November 24, 1914. Barrett still has on hand 304 pens like the 108 which he says he expects to deliver to Kraker Pen Company. Appellant Barrett & Co. expect some day to turn over to Kraker Pen Company all the penholders on hand. The Kraker Pen Company inserts the pen, reservoir, and lifting devices.

· It appears that the holders delivered by Barrett to Kraker Pen Company, while only slotted, fitted with metal nonrotating devices, and in some cases drilled for lever pivots, were nevertheless not available for use in connection with other makes or designs of fountain pens, and capable of being used only in manufacturing infringing devices. Taking into consideration that appellants openly appropriated appellee's claims; that about 1,000 holders had been delivered by Barrett & Co. to Kraker Pen Company before the patent was issued; that the penholders put out by the latter prior to November 24, 1914, would be infringing devices, as shown by defendants' sample holder, if made after such issue of the patent; that no change had been made in appellants' business at the date of the issue of the patent; that Kraker Pen Company accepted the 108 incomplete holders after the grant; that appellants had been warned to desist from making appellee's penholder, and had indicated an intention to disregard the patent; and in view of the large number of incomplete penholders in Barrett & Co.'s hands, partly made up in accordance with appellee's construction, and suitable only for manufacturing the pens like the sample holder, together with the plain imminence of infringement—we are of the opinion that appellant Barrett & Co. was guilty of contributory infringement thereof, and that the appellee, Sheaffer, is entitled to injunctive relief and an accounting as to both appellants.

The proceedings in the nature of interference now pending in the Patent Office having eventuated in findings favorable to appellee here by the examiner in interference, the examiners in chief, and the Commissioner, and the record, so far as we can gather therefrom, fully justifying the conclusions of the Patent Office in that finding, we concur in the several findings of that Office in respect to the issues of the interference and on the question of origin. In view of the failure of appellee to show infringement of claims 3, 4, 5, 7, and 11, the appellee will be required to pay one-third of the costs of this proceeding.

The decree of the District Court is affirmed as to claims 1 and 2. As to the other claims in suit, it is reversed.